PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HASTINGS MUTUAL INSURANCE CO., | ) | |
| | ) | CASE NO. 5:19CV1728 |
| Plaintiff-Counterdefendant, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| MENGEL DAIRY FARMS, LLC, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant-Counterclaimant. | ) | **ORDER** [Resolving ECF No. 37] |
| | ) | |

Pending is Plaintiff-Counterdefendant Hastings Mutual Insurance Co. ("Hastings")'

motion for summary judgment.  ECF No. 37.  The matter has been fully briefed.  ECF Nos. 37,

44, and 47.  For the reasons explained below, the motion is granted in part and denied in part.

**I.  Background**

**A.  First Insurance Claim**

This litigation concerns the death of several cows and calves ("livestock") at Defendant-

Counterclaimant Mengel Dairy Farms, LLC ("Mengel")'s location.  Beginning in September

2018, Mengel experienced a loss of livestock, milk production, and profits.  ECF No. 21 at

PageID #: 228, ¶ 4.  Mengel was unaware of the cause of these losses.  *Id.*  During all relevant

times, Mengel had an insurance policy ("the Policy") with Hastings.  ECF No. 1-1.  Mengel filed

a claim for the death of the livestock, cost of investigation and repairs, and lost business profits

("First Insurance Claim") in February 2019.  ECF No. 51 at PageID #: 881, ¶ 10; ECF No. 37-1.

Mengel retained Concept Electric, Inc. ("Concept") to determine the cause of the losses.

ECF No. 21 at PageID #: 229, ¶ 8.  Concept discovered a stray electric current was present on the

(5:19CV1728)

property.  *See* ECF No. 51 at PageID #: 882, ¶ 19; ECF No. 44-4.  In March 2019, Hastings sent

a consultant, Jesus Lopez of Fire and Explosion Consultants LLC ("FEC"), to investigate.  ECF

No. 44-13 at PageID #: 714, 717.  Hastings' Claim Notes indicate that Lopez found no stray

voltage on site during the inspection.  *Id.* at PageID #: 714.  Although Lopez found no stray

voltage that day, the Claim Notes provide that the "engineer believes it has been there" and

caused the losses on the dairy farm.  *Id.* at PageID #: 713.  The notes state: "Coverage: Appears

electrocution is the cause.  High voltage caused the cows to stop eating and production to fail.

Cows and calves died."  *Id.*  Lopez issued a report in late May 2019, indicating that "electrical

stray currents that produce electrical stray voltages of sufficient magnitude to cause the detriment

to the cows' and calves health exists."  ECF No. 44-5 at PageID #: 657;  ECF No. 21 at PageID

#: 229, ¶¶ 9-10.  Hastings investigated the claim until July 2019.  *See* ECF No. 51; ECF No. 44-

13.

     After investigating the incident, Hastings partially accepted the First Insurance Claim,

paying for the death of the livestock and the cost of investigating the stray voltages but rejecting

coverage regarding loss of business income.  ECF No. 51 at PageID #: 883, ¶ 30; ECF No. 1 at

PageID #: 3-4, ¶¶ 19-22.  In late July 2019, Hastings commenced the instant declaratory action to

determine whether the loss of business income was covered under the Policy.  *See* ECF No. 51 at

PageID #: 883, ¶ 31; ECF No. 1.

**B.  Second Insurance Claim**

     After this lawsuit was filed, Mengel submitted an additional claim for death of livestock,

costs of additional investigation and repair, and additional lost profits. ("Second Insurance

(5:19CV1728)

Claim") to Hastings. ECF No. 51 at PageID #: 884, ¶ 32; ECF No. 21 at PageID #: 229, ¶¶ 17-18. On November 6, 2019, Hastings issued a letter on Mengel's Second Insurance Claim, informing Mengel that Hastings was reserving its rights to contest coverage, its Second Insurance Claim may be subject to exclusions under the Policy, and that there was an ongoing investigation into the second claim. *See* ECF No. 37-4. The letter also suggests the investigation has been hindered in part by Mengel and requests Mengel's cooperation with the investigation of the Second Insurance Claim. *See id.* The reservation of rights letter did not outright deny coverage for the claim. *See id.*

Mengel subsequently amended its counterclaims against Hastings to include the Second Insurance Claim. *See* ECF No. 21. Hastings contends that it is waiting to decide coverage for the Second Insurance Claim until the Court rules on its declaratory action. *See* ECF No. 47 at PageID #: 737.

### C. Hastings' Declaratory Judgment Claims

Hastings invokes two claims for declaratory judgment. The Court discusses the relevant Policy provisions and declaratory judgments sought below.

#### 1. First Claim for Declaratory Judgment- Farm Business Income And Extra Expense

Under the Policy, Hastings will cover loss of business income "sustain[ed] due to the necessary suspension of your operations during the period of restoration." ECF No. 1-1 at PageID #: 91. The loss of business income "must be caused by or result from a Peril Insured Against." *Id.*

3

(5:19CV1728)

Hastings seeks a declaratory judgment holding that (1) Mengel never suspended its operations and (2) coverage for the loss or damage resulting from the stray voltage on the property is not triggered when Mengel was not subject to a "necessary suspension" of farming operations. ECF No. 1 at PageID #: 7.

### 2. Second Claim for Declaratory Judgment- "Perils Insured Against"

The Policy provides coverage for the insured when a myriad of perils occur on the property. *See* ECF No. 1-1 at PageID #: 35. Under the Policy, Hastings covers the death or destruction of livestock "which results directly from or is made necessary by," including among other things, "electrocution." *Id.* at PageID #: 36.

Relative to this second claim, Hastings seeks a declaratory judgment finding that: (1) Mengel's loss or damage must be caused by or result from a "Peril Insured Against" in order to trigger coverage; (2) Mengel's loss or damages was caused directly by dehydration, which in turn was the result of the livestock's reaction to the intermittent stray electric current; and (3) coverage for loss or damages is not triggered when it was not caused by or the result from a "Peril Insured Against." ECF No. 1 at PageID #: 7.

### D. Mengel's Counterclaims

Mengel filed counterclaims for (1) breach of contract; (2) insurance bad faith; (3) breach of good faith and fair dealing; and (4) unjust enrichment. ECF No. 21. Hastings filed the pending motion for summary judgment on all of its claims for declaratory relief and Mengel's counterclaims.

4

(5:19CV1728)

## II. Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial."  *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  To defeat the motion, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant."  *Guarino*, 980 F.2d at 403.  In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

5

(5:19CV1728)

"The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  The fact in dispute must be "material," and the dispute itself must be "genuine."  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Scott*, 550 U.S. at 380.  In determining whether a factual issue is "genuine," the Court assesses whether the evidence is such that a reasonable jury could find that the non-moving party is entitled to a verdict.  *Id.* ("[Summary judgment] will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### III.  Discussion

Hastings asserts three bases for its summary judgment motion: (1) the Policy is not triggered because there was no "electrocution;" (2) Mengel is not owed coverage for loss of business income under the Policy because there was no "necessary suspension;" and (3) Mengel's counterclaims must be dismissed because Hastings did not owe Mengel coverage.  The Court considers each of these matters below.

### A.  "Perils Insured Against" Under the Policy

Hastings' second claim for declaratory judgment demands separate findings from the Court: (1) an interpretation of the term "electrocution" in the Policy and (2) a fact determination that the livestock died from means other than electrocution.  The request for interpretation of the policy provision is a matter of law for the Court to decide.  The determination of cause of death requires resolution of the parties' factual dispute.

6

(5:19CV1728)

### 1.  Interpretation of the Term "Electrocution"

"A federal court sitting in diversity applies the substantive law of the state in which it sits."  *Hayes v. Equitable Energy Res. Co.,* 266 F.3d 560, 566 (6th Cir. 2001) (citations omitted).  Sitting in diversity, the Court applies Ohio law to the Policy.

Courts apply contract law when interpreting insurance policies.  *St. Marys Foundry, Inc. v. Emp'rs Ins. of Wausau,* 332 F.3d 989, 992 (6th Cir. 2003) (citing *Weiss v. St. Paul Fire & Marine Ins. Co.,* 283 F.3d 790, 796 (6th Cir. 2002)).  Determining whether an insurance provision is ambiguous is a matter of law decided by the Court.  *See Potti v. Duramed Pharm., Inc.,* 938 F.2d 641, 647 (6th Cir. 1991).  When a term in an insurance policy is reasonably susceptible to more than one meaning, courts construe the term in favor of the insured and against the insurer.  *Neal-Pettit v. Lahman,* 928 N.E.2d 421, 424 (Ohio 2010).  "[I]n order to defeat coverage, 'the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question.'"  *Andersen v. Highland House Co.,* 757 N.E.2d 329, 332 (Ohio 2001) (citations omitted).   Notwithstanding, this construction under Ohio law is limited to terms that are truly ambiguous.  *Schmidt v. Travelers Indem. Co. of Am.,* 101 F. Supp. 3d 768, 776 (S.D. Ohio 2015) (citations omitted).  If the Court finds the term is susceptible to two possible meanings, the Court need not weight in on whether the insured's  "interpretation of the contract is the best one so long as it is reasonable."  *Scott Fetzer Co. v. Zurich Am. Ins. Co.,* 769 F. App'x 322, 326 (6th Cir. 2019).

(5:19CV1728)

The Policy provides coverage "against direct physical damage to covered property caused by the following perils" including the "death or destruction of livestock which results directly from or is made necessary by . . . electrocution." ECF No. 1-1 at PageID #: 35, 36.  Hastings contends that the Policy cannot apply under the circumstances alleged by Mengel because the term "electrocution" is synonymous with instant death from an electric shock.  According to Hastings, it is not obligated to provide coverage to Mengel under the Policy for "electrocution" because the livestock did not die immediately from the electric current.  In support of its position, Hastings cites various authorities discussing "electrocution" in the context of an execution of a guilty criminal defendant by means of the electric chair.  *See* ECF No. 37 at PageID #: 311-13.

Because the term "electrocution" is not defined in the Policy, the Court must "interpret that term consistent with its ordinary meaning." *Evanston Ins. Co. v. Certified Steel Stud Ass'n, Inc.*, 787 F. App'x 879, 884 (6th Cir. 2019) (citing *Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130, 1141 (Ohio Ct. App. 2008)).  The most recent edition of Black's Law Dictionary does not define "electrocution" or "electrocute." *See* Black's Law Dictionary (11th ed. 2019).  Merriam-Webster defines "electrocute" as "to kill *or severely injure* by electric shock" or "to execute (a criminal) by electricity" (emphasis added).  *Electrocute*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/electrocution (last visited May 13, 2020); *see also Berrylane Trading, Inc. v. Transp. Ins. Co.*, 754 F. App'x 370, 376 (6th Cir. 2018) (referring to the Merriam-Webster Dictionary's definition of a term).  Under Merriam-Webster's definition, "electrocution" encompasses not only death but also injury caused by an electric shock.

8

(5:19CV1728)

Jurisprudence on the meaning of the term "electrocution" outside the context of the death penalty is scant.  Only one court has stated that electrocution means death by electrical shock.  That mention was relegated to a footnote with little analysis of the meaning of the term.  *See Sanford v. Astrue*, No. 5:08cv43-RH/WCS, 2008 WL 5232736, at *4 n.5 (N.D. Fla. Dec. 11, 2008).  Another court considered a dispute over the meaning of the term "electrocution" in an insurance policy but, ultimately, decided the case on the interpretation of a different phrase in the policy.  *See Hudson v. Farm Family Mut. Ins. Co.*, 697 A.2d 501, 503 (N.H. 1997).  Against this backdrop, the Court finds little support for resolution of this matter from the aforementioned authorities.  *See also R.W. Beckett Corp. v. Allianz Glob. Corp. & Spec. SE*, No. 1:19-CV-428, 2020 WL 1975788, at *10 (N.D. Ohio Apr. 24, 2020) (concluding a term was ambiguous in absence of ruling from Ohio Supreme Court and in face of conflicting case law among Ohio state courts and the Sixth Circuit).

Additionally, the Policy provides coverage not only for "death" resulting from "electrocution" but for "destruction" of the livestock from the same peril.  The definitions of "destruction" under both Black's Law Dictionary and Merriam-Webster's Dictionary suggest that the term encompasses more than just death.  *See Destruction*, Black's Law Dictionary (11th ed. 2019); *Destruction*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/destruction (last visited May 15, 2020).  When interpreting the meaning of the term "destruction," the Sixth Circuit has noted that "[d]estruction does not have to be total."  *Republic/NFR & C Parking of Louisville v. Reg'l Airport Auth. of Louisville and Jefferson Cty.*, 410 F.3d 888, 892 (6th Cir. 2005) (citations omitted).  Considered

9

(5:19CV1728)

in tandem with the definition of "electrocution," the use of the term "destruction" in the Policy

for loss of animals suggests that electrocution can consist of an event that does not necessarily

lead to instant death but may nevertheless cause irreparable harm.  Mengel's interpretation is

bolstered by the fact that Hastings uses the terms "stray voltage" and "electrocution"

interchangeably in the Claim Notes.  *See* ECF No. 44-13 at PageID #: 713.

    In accordance with Ohio law, the Court finds that the meaning of the term "electrocution"

is ambiguous under the Policy.  Because Mengel's understanding of "electrocution" to

encompass damage or injury caused by stray electric voltages is a reasonable interpretation of the

Policy, the Policy shall be construed in favor of coverage for the insured, Mengel.

### 2.  Declaratory Request for Finding Cause of Death of the Livestock

    When the facts are not in dispute, the Court may determine whether the facts alleged fall

under the umbrella of the insurance provision and grant or deny summary judgment accordingly.

*See Sarrough v. Budzar*, 38 N.E.3d 921, 930-34 (Ohio Ct. App. 2015).  When there is a genuine

dispute of the underlying facts concerning the policy provision, even under the liberal

construction of the insurance policy in favor of insured, summary judgment is appropriately

denied.  *See Hawk v. Stocklin,* No. 1–13–56, 2014 WL 2525861, at *9 (Ohio Ct. App. June 2,

2014) (finding that trial court erred by granting summary judgment when there was a factual

dispute over whether the facts met the terms of the policy); *Giancarli v. Nationwide Mut. Ins.

Co.*, 449 N.E.2d 517, 519 (Ohio Ct. App. 1982) (finding that a matter of application could be

decided by trier of fact when facts are in dispute even when construing the term in favor of the

insured).

(5:19CV1728)

The Policy provides coverage when the death or destruction of the animals "results directly from or is made necessary by . . . electrocution."  ECF No. 1-1 at PageID #: 36.  In other words, the Policy requires proof that the electric stray voltages were the cause of the livestock's "death or destruction."

Based on the record, the request for a fact determination of the cause of death of the livestock cannot be determined at summary judgment.  In the case at bar, the issue of whether the livestock died from electrocution, or stray electric current under Mengel's interpretation of the Policy, is contested by the parties.  See Gibson v. State Farm Mut. Auto Ins. Co., 704 N.E.2d 1, 10 (Ohio Ct. App. 1997) (denying summary judgment on declaratory action claim when facts over causation are in dispute).  Under the construction of the insurance policy in favor of coverage for a stray electric current, Hastings' expert, Dr. Justin D. Kieffer, claims that the live stock died from disease and management factors, rather than stray electric current.  See ECF No. 37-6.  Mengel retained experts whom suggest otherwise.[1]  This hotly contested issue may not be decided at summary judgment because there is a genuine dispute of material fact regarding whether the electric stray voltage contributed to or caused the cattle's death.  To the extent

_____

[1] Mengel's reliance on experts in this matter is the subject of a pending motion to strike.  See ECF No. 46.  The Court need not resolve the motion to strike to decide the pending summary judgment motion, because even Hastings' own engineering consultant acknowledged there was a stray current on the property of "sufficient magnitude to cause the detriment to the cows' and calves' health . . ."  ECF No. 44-5 at PageID #: 657.  Additionally, at least one of Mengel's experts, Sherry Smith, who is not subject to the pending motion to strike, see ECF No. 46, has indicated that stray voltage could explain the low water intake and health issues seen in the cattle.  See ECF No. 37-5 at PageID #: 342-43.

(5:19CV1728)

Hastings requests that the Court issue a declaratory judgment finding that the livestock died due to means other than shock from electrical current, the motion for summary judgment is denied.

Accordingly, summary judgment on Hastings' second claim for declaratory judgment is denied.

**B. "Necessary Suspension" Under the Policy**

The Policy's Farm Business Income and Extra Expense provision provides, in relevant part: "We will pay for the actual loss of business income . . . you sustain due to the necessary suspension of your operations during the period of restoration." ECF No. 1-1 at PageID #: 91. Additionally, the Policy clearly indicates that the damages that led to the necessary suspension "must be caused by or result from a Peril Insured Against." *Id.*

Hastings maintains that even if the Policy covers the circumstances alleged under insured perils, namely electrocution, Mengel has not satisfied the prerequisite of demonstrating that it "necessar[ily] suspen[ded]" its operations. According to Hastings, coverage for lost business income is only triggered by a complete shutdown of all business activity. Mengel, on the other hand, suggests that a mere reduction in operations is sufficient to fall within the policy's scope.

The Court, again, relies on contract interpretation to determine the meaning of the term "necessary suspension" in the Policy. Courts interpreting the term "necessary suspension" in an insurance policy have overwhelmingly held that the term requires a complete cessation, even if temporary, as opposed to a mere slowing down of business before coverage is triggered. *See, e.g.*, *Apartment Movers of Am., Inc. v. One Beacon Lloyds of Tex.*, 170 F. App'x 901 (5th Cir. 2006) (per curiam); *Am. States Ins. Co. v. Creative Walking, Inc.*, 16 F. Supp. 2d 1062, 1065

12

(5:19CV1728)

(E.D. Mo. 1998), *aff'd*, 175 F.3d 1023 (8th Cir. 1999) (unpublished table decision); *Home Indem. Co. v. Hyplains Beef, L.C.*, 893 F. Supp. 987, 991 (D. Kan. 1995); *see also Broad St., LLC v. Gulf Ins. Co.*, 37 A.D. 3d 126, 131-32 (N.Y. App. Div. 2006); *Buxbaum v. Aetna Life & Cas. Co.*, 126 Cal. Rptr. 2d 682, 687-94 (Cal. Ct. App. 2002) (describing the state court authorities addressing the interpretation of "necessary suspension").  Although the aforementioned authorities are not binding, the Court finds them compelling and to suggest that the Policy requires a complete cessation of all business activities.

Mengel's reliance on *American Medical Imaging Corp. v. St. Paul Fire and Marine Insurance Co.*, 949 F.2d 690 (3d Cir.1991) is unavailing.  In *American Medical Imaging Corp.*, the insured's office suffered damage from a fire.  *Id.* at 692.  The insured subsequently made "temporary arrangements for alternative space" and had a "reduced telephone capacity at the temporary location."  *Id.*  The insured sought coverage for lost earnings from the fire and due to reduced business operations.  *Id.*  Unlike the provision in the case at bar, the insurance policy in *American Medical Imaging Corp.* covered both "necessary *or potential suspension*."  *Id.* (emphasis added).  In its opinion, the Third Circuit emphasized the different applications of the provision by noting that the fire that destroyed the office was a "necessary suspension" whereas the company confronted a "potential suspension" after the fire when it had reduced business activity "of a much longer duration."  *Id.*  The evidence of this separate application is underscored by the Third Circuit's use of the phrase "from such *suspensions*," suggesting the court was differentiating between the "necessary suspension" caused by the fire and the "potential suspension" of the reduced business activity after the fire.  *Id.* (emphasis added).

13

(5:19CV1728)

Moreover, the Third Circuit noted that there were other provisions of the contract that signaled an intent to cover losses even when activity continued at a slowed pace.  *Id.* at 693.  Contrary to Mengel's contention, *American Medical Imaging Corp.* does not support its position that a "necessary suspension" includes a temporary reduction in business activity.

Additionally, a "necessary suspension" is different from a temporary "interruption" of business.  *See Archer Daniels Midland Co. v. Aon Risk, Servs., Inc. of Minn.*, 356 F. 3d 850, 857 (8th Cir. 2004) ("The cases cited by both parties demonstrate that parties to an insurance contract can require a slowdown or cessation of business before extra expense coverage applies."); *Home Indem. Co.,* 893 F. Supp. at 991-92.

The Court finds that a complete cessation of business activity is required to constitute a "necessary suspension."  Despite the losses that Mengel has experienced, it has not provided evidence suggesting it entirely stopped its operations.

 Accordingly, Hastings' motion for summary judgment on its first claim for declaratory judgment is granted.

### C.  Mengel's Counterclaims

#### 1.  Counterclaim I– Breach of Contract

Mengel has filed a breach of contract counterclaim against Hastings regarding both its First and Second Insurance Claims.  Because a necessary suspension did not occur on the property, Mengel cannot base its counterclaim on its request for additional profits.

To the extent that Mengel's breach of contract claim stems from the First Insurance Claim, Mengel has already been paid for the First Insurance Claim regarding the loss of live

14

(5:19CV1728)

stock and the investigation pertaining to those losses.  Mengel has no right under the Policy to

additional lost profits because there was no necessary suspension.  Accordingly, Mengel cannot

sustain a breach of contract action against Hastings to the extent it relies upon the First Insurance

Claim.

Hastings issued a reservation of rights regarding the Second Insurance Claim for the

deaths of additional livestock but has not outright rejected coverage for those claims.  A triable

issue remains regarding whether the stray voltage caused the death of the livestock.  *See Perry v.*

*Allstate Indem. Co.*, 953 F.3d 417, 423 n. 5 (6th Cir. 2020) (finding that the breach of contract

claim did not fail when the policy was interpreted in favor of insured).  To the extent that the

breach of contract counterclaim for the Second Insurance Claim concerns the loss of livestock

and additional repairs, but not additional profits, summary judgment is denied.

### 2.  Counterclaims II and III – Bad Faith and Breach of Duty of Good Faith and Fair Dealing[2]

Mengel has raised counterclaims of bad faith denial of insurance coverage and breach of

duty of good faith and fair dealing against Hastings.  Ohio law dictates that "an insurer has the

duty to act in good faith in the handling and payment of the claims of its insured."  *Hoskins v.*

*Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983).  An insurance provider acts in bad faith

when "its refusal to pay the claim is not predicated upon circumstances that furnish reasonable

---

[2] Mengel's claim alleging a lack of good faith is reviewed under the same standard for bad faith.  *See Hoskins*, 452 N.E.2d at 1320 ("A lack of good faith is the equivalent of bad faith . . . ." (citation omitted).

15

(5:19CV1728)

justification therefor."[3] *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994) (citations and internal quotation marks omitted).  "[I]ntent is not an element of the 'reasonable justification' standard." *Fair v. State Farm Fire and Cas. Co.*, 426 F. Supp. 2d 672, 677-78 (N.D. Ohio 2006) (citing *Zoppo*, 644 N.E.2d at 397, 400).  "Summary judgment in favor of the insurer is appropriate whe[n], viewing the evidence in the light most favorable to the insured, the claim was fairly debatable and the refusal was premised on the status of the law at the time or the facts that gave rise to the claim." *B-T Dissolution, Inc. v. Provident Life & Accident Ins. Co.*, 123 F. App'x 159, 164 (6th Cir. 2004) (citation omitted); *see also Corbo Properties Ltd. v. Seneca Ins. Co., Inc.*, 771 F. Supp. 2d 877, 880-81 (N.D. Ohio 2011).  Mere negligence of an insurer is insufficient to sustain a bad faith claim. *Klein v. State Farm Fire & Cas.*, 250 F. App'x 150, 156-57 (6th Cir. 2007) (citation omitted).  The burden is on the insured to establish bad faith. *Marsteller v. Sec. of Am. Life Ins. Co.*, No. 3:01CV7258, 2002 WL 31086111, at *7 (N.D. Ohio Sept. 12, 2002) (citations omitted).

---

[3] In stating its bad faith counterclaim, Mengel refers to both the Ohio Consumer Sales Practice Act ("OCSPA") and Ohio Admin. Code § 3901-1-54.  As an insurance company, Hastings is not subject to liability under the OCSPA. *See Schaller*, 496 F. Supp. 2d at 901-02 ("One of the 'persons' excepted out of the OCSPA by § 5725.01 is an 'insurance company' . . . .  Further, as the OCSPA does not apply to insurance companies, National is entitled to summary judgment as a matter of law.")  Additionally, the cited regulation does not provide a private right of action and may not serve as the standard for evaluating bad faith insurance claims. *See Bolton v. State Farm Fire & Cas. Co.*, No. 3:16 CV 220, 2017 WL 5132732, at *16 (N.D. Ohio Nov. 6, 2017); *Arrowood Indem. Co. The Lubrizol Corp. v. U.S. Fire Insurance Co.*, No. 1:10 CV 2871, 2016 WL 6634747, at *4 (N.D. Ohio Feb. 22, 2016); *Arch Specialty Ins. Co. v. J.G. Martin, Inc.*, No. 1:06 CV 704, 2006 WL 8446789, at *1 (N.D. Ohio July 12, 2006).

(5:19CV1728)

Mengel has informed the Court that Hastings has redacted pages of the Claim Notes that

may be relevant evidence of Mengel's bad faith insurance counterclaim.  *See* ECF No. 44-13

(Claim Notes); ECF No. 44 at PageID #: 625 (listing "[f]ailing to produce a complete and

unredacted copy of its claim log" as evidence of Hastings' bad faith).  In response, Hastings

states that it has asserted "privileges" for redacting those pages but has not indicated what

"privileges" it is relying upon.  ECF No. 47 at PageID #: 749.  Even if these redacted pages of the

Claim Notes implicate the attorney-client privilege, under Ohio law, there is a broad exception to

attorney-client privilege when the documents sought are relevant to the question of whether the

insurer acted in bad faith:

> In *Boone v. Vanliner*, 91 Ohio St.3d 209, 744 N.E.2d 154 (2001), the Ohio
> Supreme Court established a common law exception to Ohio's attorney-client
> privilege in cases involving allegations that an insurer denied an insured's claim
> in bad faith . . . . Reasoning that "claims files materials that show an insurer's lack
> of good faith in denying coverage are unworthy of protection," the Ohio Supreme
> Court held that the attorney-client privilege did not apply to documents
> containing evidence of bad faith on the part of an insurer . . . It then ordered
> Vanliner to produce all claims file materials "related to the issue of coverage that
> were created prior to the denial of coverage."

*In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 441-42 (6th Cir. 2009); *see also William Powell Co.*

*v. Nat'l Indem. Co.*, No. 1:14-cv-00807, 2017 WL 1326504, at *18 (S.D. Ohio Apr. 11, 2017) (

"Under *Boone*, OneBeacon is not entitled to assert the attorney-client privilege as to those

attorney communications from the claims file that 'may cast light' on the bad faith insurance

claim."); *Chubb Customs Ins. Co. v. Grange Mut. Cas. Co.*, No. 2:07–CV–1285, 2012 WL

1340369, at *4-7 (S.D. Ohio Apr. 17, 2012).  Notably, the Sixth Circuit indicated that "[t]he

17

(5:19CV1728)

leading Ohio Court of Appeals case, *Garg v. State Auto. Mut. Ins. Co.*, 155 Ohio App.3d 258, 800 N.E.2d 757 (2003), read *Boone* to require the disclosure of all documents that '*may* cast light' on whether the insurer acted in bad faith." *In re Prof'ls Direct Ins. Co.*, 578 F.3d at 442 (citations omitted) (emphasis in original).  The redacted pages from the Claim Notes may cast light on whether Hastings acted in bad faith and the Court has not been presented with sufficient evidence to suggest otherwise.

Even if Hastings is relying upon a privilege other than the attorney-client privilege, there is a question of whether the Court has the full range of relevant evidence to resolve summary judgment on the bad faith insurance counterclaim.  Because Hastings has failed to produce this potentially relevant evidence, the Court cannot properly determine whether there is a genuine dispute of material fact.  Based on the record before the Court, summary judgment on Mengel's bad faith insurance counterclaims is denied.

### 4.  Counterclaim IV–Unjust Enrichment

"Under Ohio law, the existence of a valid, enforceable contract covering the subject of a dispute generally precludes a claim for unjust enrichment." *Cleveland Cent. Catholic High Sch. v. Mills*, 125 N.E.3d 328, 340 (Ohio Ct. App. 2018).  Because the parties' dispute is governed by the contract, Mengel's unjust enrichment claim fails as a matter of law.  *See North Cent. Elec. Coop., Inc. v. Linde, LLC*, No. 3:16-cv-1890, 2019 WL 460485, at *4 (N.D. Ohio Feb. 6, 2019). Accordingly, summary judgment is granted on Mengel's unjust enrichment counterclaim.

### IV. Conclusion

For the reasons explained above, Hastings' motion is granted in part and denied in part.

18

(5:19CV1728)

In sum, Hastings' motion for summary judgment pertaining to the definition and application of the term "electrocution" in the Policy and its second claim for declaratory judgment is DENIED.

Hastings' motion for summary judgment regarding its first claim for declaratory judgment, finding that a "necessary suspension" requires a complete cessation of all business activity and that no such suspension has occurred on Mengel's property, is GRANTED.

Summary judgment is GRANTED to the extent that Mengel's breach of contract counterclaim is grounded in the First Insurance Claim.  Summary judgment is DENIED on this counterclaim, however, concerning the Second Insurance Claim, except to the extent it is based on the claim for loss of business income.

Summary judgment is DENIED regarding Mengel's bad faith insurance counterclaims and GRANTED on the unjust enrichment counterclaim.


IT IS SO ORDERED.


   May 19, 2020                          /s/ Benita Y. Pearson
Date                                 Benita Y. Pearson
                                     United States District Judge